# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SHAROC RICHARDSON,

Defendant-Appellant.

UNPUBLISHED
May 26, 2016

No. 322195
Wayne Circuit Court
LC No. 13-009830-FC

Before: OWENS, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of voluntary manslaughter, MCL 750.321. The trial court initially sentenced defendant, as a third habitual offender, MCL 769.12, to 150 to 360 months' imprisonment. Thereafter, the trial court granted defendant's request for a resentencing hearing after which defendant was resentenced to 129 months to 30 years' imprisonment for the conviction. For the reasons set forth in this opinion, we affirm defendant's conviction, but vacate and remand that portion of defendant's sentence dealing with restitution.

## I. BACKGROUND

This appeal arises from the stabbing death of Joyce Merritt. The death occurred sometime in the late evening hours of October 3, 2013 or the early morning hours of October 4, 2013. Joyce's body was found on the porch of her brother Danny Merritt's home by Merritt's next door neighbor, Robert Brown. Danny was in the hospital recovering from a leg amputation and had asked defendant to stay at his home. Danny was aware that his sister and defendant drank together and when they did, they argued. Brown was also familiar with defendant and Joyce, and their habit of arguing "just about every time they got to drinking." Brown awoke on the morning of October 4, 2013, between 5:00 a.m. and 7:00 a.m., to find a blood trail leading from his porch toward Danny's house. Brown followed the trail back to Danny's porch, where he found Joyce's motionless body lying in a pool of blood. There, Brown noticed defendant's bicycle leaning up against a fence and assumed defendant was inside the house. He did not knock on the door, but called the police. Paramedics and police officers began arriving on scene about 15 minutes later. When Detroit Police Officer Breeana Ortiz arrived around 8:00 a.m., defendant had not yet emerged from inside Danny's home.

Detroit Police Sergeant Michael Dicicco and Officer Kevin Zarosly arrived on scene between 8:15 a.m. and 8:30 a.m., and approved forced entry into Danny's home after observing

-1-

blood between the front screen door and storm door leading inside the house. Dicicco knocked on the door while Zarosly approached one of the front windows of the home and Ortiz approached the other. No one answered the door. However, Ortiz and Zarosly noticed that the windows were slightly ajar. Both officers moved curtains aside and looked into the front living area of the home. The officers observed two men; one lying on a couch near Ortiz's window and one standing near another couch closer to Zarosly's window. The officers yelled at the men to come outside, and defendant immediately opened the front door. Dicicco handcuffed defendant and moved him out onto the lawn before he, Zarosly, and Ortiz secured the rest of the house. The officers observed "dark, dirty and bloody trails leading into the house," and followed them into the front room, where they led across the carpet toward the couch defendant had been standing next to. The officers carefully stepped around the blood and approached the other man, still lying on the couch closest to Ortiz's window. The man, later identified as Morgan Howze, was very cooperative but a leg injury rendered him unable to move without assistance. The officers helped Howze stand up and walk outside the house.

The officers located two black folding pocket knives on the floor near the coffee table where the officers had seen both men, and a kitchen knife from inside a basket sitting atop a white stand. The officers collected all three knives as evidence, though none of the knives had signs of blood or fingerprints. The officers also found several additional knives in the kitchen, but did not collect them. The officers collected one cell phone from near the coffee table in the living room and another cell phone they found underneath Joyce's body on the porch.

After their search of the home, officers followed the trail of blood from Joyce's body, down the front stairs, and out toward the sidewalk. The blood trail, which was "very evident," led in two different directions once it reached the sidewalk. Police collected samples of blood from five different areas: (1) a large pool on the sidewalk just West of Danny's house, (2) the chair on Brown's front porch, (3) the sidewalk outside the front gate of Brown's house, (4) the coffee table inside Danny's house, and (5) the carpet inside Danny's house. DNA analysis of all five blood samples revealed that each sample matched Joyce's blood, and no foreign DNA was discovered. The knives were not sent for DNA processing or fingerprint analysis. Detective Nancy Foster, the officer-in-charge of the case after McGinnis, later made the decision not to send the knives for testing because they were "too clean" to be of any real evidentiary value.

As officers collected evidence, Ortiz stood outside with defendant, who was still in handcuffs. Ortiz told defendant several times not to say anything to her, but defendant refused to stop talking as she stood there with him. Ortiz said defendant seemed nervous, and described his behavior as "very agitated[,] very irritated and very rude." She noticed that defendant refused to look at Joyce's body, although his eyes seemed to wander everywhere else. He would repeat phrases like "I did not do that," or "I did not kill that person," never referring to Joyce by name despite their friendship. He told Ortiz that he had seen "that person" the previous evening, when she came over to his house and he let her borrow his cell phone, but did not provide any additional information.

According to Ortiz, when compared to defendant, Howze was very calm and "went along with the program." Howze agreed to a videotaped interview with her later that afternoon.

Howze, who Foster later described as "a very pleasant man," was 62 years old and homeless at the time of the incident.[1] He had only known defendant, whom he called "Richard," for about three weeks prior to the incident. The two men had met at a liquor store down the block from Danny's house, and defendant agreed to let Howze stay with him for a while. Howze had arrived at Danny's house after dark on "the night that Joyce was killed." Defendant was already there, and the two men sat around in the living room drinking whiskey for two or three hours. Howze became very intoxicated, but could not tell if defendant was intoxicated as well. At some point that evening, defendant left the room. Howze did not know where defendant went, and Howze fell asleep on a couch shortly thereafter. Howze remembered waking sometime later to the sound of defendant arguing with someone, but he could not tell who the other person was. Their argument lasted about 20 minutes and Howze fell back asleep.

Sometime later, Howze awoke again and defendant was in the living room. Defendant told Howze that he and Joyce had been arguing and then walked back out of the room. Howze did not see defendant pick anything up or notice if defendant had been carrying anything, and he did not see Joyce that night. Howze did not hear any additional arguing, and he dozed off again. After what Howze thought was another 20 minutes, defendant woke him up and told him that "Joyce was on the front porch [and] that she was dead." Howze thought defendant was joking, so he went back to sleep. He did not wake up again until the next morning, when Ortiz shouted at him through the window and he discovered that Joyce was dead.

Defendant testified at trial. He explained that he had known Joyce since 2009, and referred to her as "Hurricane Joyce" because the two had a heated relationship. According to defendant, Joyce had "called the police on him for no reason" on several occasions. They were not really friends, but bonded as mutual heavy drinkers. Defendant admitted that they argued frequently after they had been drinking. Defendant claimed that these fights would often end with Joyce attacking him, but he never "attacked her back."

Defendant said he first ran into Joyce around 4:30 p.m. on October 3, 2013. He had been drinking since that morning, and he continued drinking with her after she arrived at Danny's house looking for whiskey. (About an hour later, Joyce walked outside and met a group of "fellas at the gate." Defendant said he overheard an argument between Joyce and the men, but he did not hear what it was about. The men left and Joyce walked back to Danny's. Referring to the men, defendant told her that he was not going to allow that "type of people" around the house. According to defendant, Joyce became very angry and the two argued until Joyce left with two unidentified friends. Defendant said he had not been upset.

Defendant explained that he continued to drink until after dark, went to the liquor store for more whiskey, and returned to Danny's to find Howze. There, the two men drank some more. At about 8:00 p.m., defendant went to sleep in a bedroom, waking up around 11:00 p.m. and going out to the living room, where he noticed Howze still sleeping on one couch.

---

[1] In fact, Foster would pick Howze up and transport him to every court proceeding. Howze testified at the preliminary examination, but, as will be discussed in further detail *infra*, he passed away prior to defendant's trial.

Defendant fell asleep on the other couch. Defendant testified that sometime later that night, he woke to find Joyce "bouncing up and down on his chest" with a knife pointed at his eye and a "spooky look on her face." Defendant told her to get off of him and tried to sit up, but she told him to "shut up" and that he could not tell her what to do in her brother's house. Defendant claimed that Joyce then cut him underneath his eye. He grabbed her right hand, the hand holding the knife, and pushed her off so that he could stand up. Defendant tried to run around the coffee table to get away, but Joyce chased him with "a folded pocket knife." A struggle ensued and, at some point, defendant struck Joyce in the neck with a knife. Defendant said he had not intended to kill her, but that he had needed to act in self-defense: "[I] figured she was out to kill me[,] she had already almost blinded me." He claimed that everything was happening really fast, and that he stabbed her because he "just wanted her to stop assaulting [him]."

When defendant struck Joyce, she stopped, looked at the floor, and held her hand over the wound. Defendant said that he could not tell how bad the wound was, but he could see blood between her fingers. Defendant said he immediately began looking for a cell phone and a towel to help her, but she ran outside and down the sidewalk in the direction of the liquor store. Defendant said he could not find a cell phone, but he did find a towel and ran outside to give it to Joyce. He yelled down the street for her to come back, but she did not turn around. Defendant went back inside to keep looking for a cell phone. Defendant heard Joyce yelling out in the street, telling someone that he had cut her neck, but his head was fuzzy. Later, he went outside again and saw Joyce lying on the porch, but he was too afraid to get close to her. He tried to wake up Howze but he was unsuccessful. Once again, he looked for a cell phone to call for help. When he could not find one, he sat down on the couch and fell asleep until the police woke him the next morning. When he discovered that Joyce was dead, he did not tell the police about the previous night's attack.

Defendant was initially charged with first-degree murder, MCL 750.316(1)(a). Following the close of the State's proofs, defense counsel brought a motion for directed verdict on the first-degree murder charge. The trial court granted the motion and following the conclusion of testimony the jury was instructed to consider the charges of second-degree murder, MCL 750.317, and the lesser included offense of voluntary manslaughter. The jury found defendant not guilty of second-degree murder, but guilty of voluntary manslaughter. Defendant was sentenced as indicated *supra*. This appeal then ensued.

## II. DIRECTED VERDICT ON SECOND-DEGREE MURDER

On appeal, defendant first argues that the trial court erred when it denied his motion for a directed verdict of acquittal. This Court reviews de novo a trial court's decision on a motion for a directed verdict. *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). "A challenge to the trial court's decision on a motion for a directed verdict has the same standard of review as a challenge to the sufficiency of the evidence, except that only the evidence presented before the motion for a directed verdict was made is considered." *People v Schultz*, 246 Mich App 695, 702; 635 NW2d 491 (2001). This Court must review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found each element of the charged crimes proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

As previously stated, defendant was initially charged with first-degree premeditated murder, MCL 750.316(1)(a). At trial, the court granted defendant's motion for a directed verdict on the first-degree murder charge, however, the jury was instructed to consider the charges of second-degree murder, MCL 750.317, and the lesser included offense of voluntary manslaughter in the alternative. The jury found defendant not guilty of second-degree murder, but found the defendant guilty of voluntary manslaughter. Consequently, defendant's claim of error may be dismissed at the outset because defendant was not convicted of second-degree murder. An erroneous denial of a motion for directed verdict is harmless when defendant is ultimately acquitted on the charge, even when the defendant is convicted of a lesser offense. See *People v Graves*, 458 Mich 476, 478-479; 581 NW2d 229 (1998) (finding it unnecessary to decide whether the defendant had been entitled to a directed verdict on a first-degree murder charge after the defendant had been acquitted on that charge and instead convicted of voluntary manslaughter). In *Graves*, our Supreme Court stated: "We are persuaded by the view that a defendant has no room to complain when he is acquitted of a charge that is improperly submitted to a jury, as long as the defendant is actually convicted of a charge that was properly submitted to the jury. Such a result squares with respect for juries. Further, not to adopt this view is to countenance a misuse of judicial resources by automatically reversing an otherwise valid conviction." *Id.* at 486-487. Furthermore, defendant has failed to show that the trial court committed error when it denied his motion for a directed verdict of acquittal for the offense of second-degree murder. Accordingly, defendant is not entitled to relief on this issue.

## III. SUFFICIENCY OF EVIDENCE

Next, defendant argues that insufficient evidence was presented to support his voluntary manslaughter conviction. This Court reviews challenges to the sufficiency of evidence de novo. *People v Lanzo Const Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006). We must review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found each element of the charged crimes proven beyond a reasonable doubt. *Reese*, 491 Mich at 139. Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). This Court resolves conflicts in the evidence in favor of the prosecution, and will not interfere with the trier of fact's determinations regarding the weight of evidence and the credibility of the witnesses. *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008).

Defendant was charged with second-degree murder, but convicted of the lesser included offense of voluntary manslaughter. In *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003), our Supreme Court explained:

> A necessarily lesser included offense is an offense whose elements are completely subsumed in the greater offense.
>
> Regarding voluntary manslaughter, both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter—malice—is negated by the presence of provocation and heat of

-5-

passion. Thus, we conclude, the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice. [*Id.* (internal citations omitted).]

Defendant argues that the prosecution presented insufficient evidence for a conviction of voluntary manslaughter because it failed to show that defendant acted in the heat of passion or was adequately provoked. However, "[p]rovocation is not an element of voluntary manslaughter, [and] it need not be proven by the prosecution beyond a reasonable doubt." *People v Moore*, 189 Mich App 315, 320; 472 NW2d 1 (1991). As the *Mendoza* Court explained, adequate provocation creates a mitigating circumstance that negates the malice element necessary for a murder conviction. *Mendoza*, 468 Mich at 535-536.

The evidence presented at the close of the prosecutor's case was sufficient to support a second-degree murder conviction. The elements of second-degree murder are as follows: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without lawful justification or excuse for causing the death. *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). Here, there was sufficient circumstantial evidence to support the inference that an act of defendant caused Joyce's death. Howze testified that he heard defendant arguing with someone on the night of Joyce's murder. Shortly thereafter, defendant informed Howze that he had been arguing with Joyce, and then told Howze that he thought Joyce was dead on the porch. Joyce's body was discovered the next morning on the porch, and a blood trail led from Joyce's body to the very couch defendant had been sleeping on. Two pocket knives were discovered on the carpet next to defendant's couch. Although the carpet and table were covered in blood, both knives were clean. In fact, the officer in charge testified that the two pocket knives, along with a kitchen knife that was also discovered near the couch, had not been sent for DNA analysis or fingerprinting because they were "too clean" for tests to provide any usable evidence. In addition to the fact that the knives appeared to have been cleaned, defendant did not come to the door for an hour and a half after Brown discovered Joyce's body on the porch and police officers began arriving outside Danny's home. The arresting officers testified that when they looked inside the home's front windows they observed defendant in the front room, awake and standing next to his couch. The jury could reasonably have inferred that defendant was aware of the officers' presence and tried to avoid talking about what happened to Joyce. Defendant's argument with Joyce, his knowledge that Joyce was dead outside on the porch, and his failure to seek the help of the police supports an inference that defendant killed Joyce and was conscious of his guilt.

The evidence presented also supported the inference that defendant acted with malice. "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). "The offense of second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences." *People v Mayhew*, 236 Mich App 112, 125; 600 NW2d 370 (1999), citing *Goecke*, 457 Mich at 466. Malice may be "inferred from evidence that the defendant 'intentionally set in motion a force likely to cause death or great bodily harm.'" *Mayhew*, 236 Mich App at 125, quoting *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998).

Joyce's wound was caused by a knife, and the use of a knife alone is sufficient to support an inference of malice. *People v Carines*, 460 Mich 750, 760; 597 NW2d 130 (1999). The evidence established that Joyce's wound stretched across the entire length of her neck, deep enough to sever her internal and external jugular veins. The medical examiner testified that Joyce bled out "over many minutes." She walked out of Danny's house, around the block, over to a neighbor's home, and back to Danny's house before she finally expired. The "clearly evident" trail of blood at the crime scene is evidence that after defendant inflicted Joyce's wound, he should have been aware of the extent of her injury. Instead, he allowed her to suffer and die. See *People v McGhee*, 268 Mich App 600, 623; 709 NW2d 595 (2005) (noting that intent may be inferred from circumstantial evidence). Indeed, the police officers discovered a cell phone and charger on the carpet directly in front of the couch defendant was found standing next to on the morning Joyce's body was found. This supported the inference that defendant had access to a phone and decided not to call the police, even though he knew Joyce was either seriously injured or dead.

Because the motion for directed verdict was decided prior to defendant's testimony, the jury had not yet been informed of defendant's self-defense claim. However, even by this time, the prosecution had presented sufficient evidence to allow the jury to reject that defense. The same evidence upon which the jury could infer malice also supports an inference that defendant acted without lawful justification or excuse. Defendant's nervous behavior at the crime scene and initial denial of any involvement in Joyce's death, coupled with the evidence that he had been the one to kill her, suggested that he could not reasonably believe his actions were justified. Because there was evidence to infer the elements of second-degree murder, this charge was properly placed before the jury. *Mayhew*, 236 Mich App at 126. Accordingly, we find that the evidence presented after the trial court denied defendant's motion for a directed verdict further supported such a conviction.

Following defendant's motion for a directed verdict, defendant took the stand and admitted that Joyce had been killed as a result of his actions. While defendant argued that he acted in self-defense, he did not dispute the fact that it was his act of cutting Joyce's throat that ultimately led to her death. Additionally, defendant's testimony offered further support for the inference that he had acted with malice. He testified that he knew that Joyce was hurt. Although he claimed to have searched tirelessly for a cell phone, he did not dispute the fact that the officers retrieved a cell phone from the floor next to the couch he had been found standing next to. Indeed, defendant claimed that he had fallen asleep on that couch while purportedly searching for a cell phone. His failure to offer assistance or seek help for Joyce further supports the inference that he acted in obvious disregard of the life-endangering consequences of his actions. *Mayhew*, 236 Mich App at 125.

What constitutes adequate provocation is a question of fact for the jury. *People v Pouncey*, 437 Mich 382, 391; 471 NW2d 346 (1991). While provocation need not be proven beyond a reasonable doubt, "there must be some 'slight but sufficient' evidence in order for the instruction on voluntary manslaughter to be given." *Moore*, 189 Mich App at 320 (quoting *People v King*, 98 Mich App 146, 150-151; 296 NW2d 211 (1980)). "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *Pouncey*, 437 Mich at 389 (citations omitted). Defendant testified that he and Joyce frequently argued when they had been drinking, and that they had both

been drinking heavily on the day leading up to the murder. Defendant's testimony was supported by the testimony of Danny and Brown, who were both also familiar with defendant and Joyce's tendency to get in fights. Defendant also testified that he referred to Joyce as "Hurricane Joyce" in light of their heated relationship, and that she had, on more than one occasion, called the police to investigate him without reason. Defendant admitted that he had fought with Joyce several hours before the incident, and then again during the events that ultimately led to her death. Howze confirmed that defendant had been fighting with someone, and that defendant had told Howze he had been arguing with Joyce. This testimony amounted to "slight but sufficient" evidence upon which the jury could infer that defendant acted out of passion, rather than reason.

Defendant also argues that insufficient evidence was presented to support his conviction because the prosecutor failed to rebut his claim of self-defense beyond a reasonable doubt, but this argument lacks merit. A defendant may act in lawful self-defense if he "honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *People v Dupree*, 486 Mich 693, 707; 788 NW2d 399 (2010). If defendant's testimony had been credited by the jury, there was sufficient evidence for the jury to find that defendant acted in self-defense. Defendant testified that Joyce often fought with other people in the community, and that she had physically attacked him on prior occasions. Additionally, defendant claimed that he felt it was necessary to cut Joyce's throat to prevent further injury after Joyce had already cut his eye. However, there was also evidence to satisfy the prosecutor's burden to disprove self-defense beyond a reasonable doubt. First, the evidence supported an inference that defendant's fear was not honest or reasonable. If defendant's testimony is credited, defendant was forced to use a knife to cut the throat of a 50-year-old, 105 pound woman, after he had already been able to push her off of himself and stand up. Although defendant claims Joyce cut him under the eye, he did not produce evidence of the injury and none of the knives recovered from the crime scene had blood on them. Even if, as defendant contends, Joyce had used her knife to cut him, defendant was not automatically permitted to resort to the use of deadly force to defend himself. See *People v Riddle*, 467 Mich 116, 142-143; 649 NW2d 30 (2002) (noting that, generally, a defendant is not entitled to use any more force than is necessary to defend himself); MCL 780.972(1)-(2) (outlining the conditions under which an individual is privileged to use deadly force or force other than deadly force). Based on Joyce's size and the fact that defendant was able to get away from her, the jury could rationally have concluded that defendant could not have believed his use of force was necessary to prevent further injury.

Finally, there was no evidence that defendant acted in self-defense other than defendant's own testimony, which the jury was free to disbelieve. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748, amended 441 Mich 1201 (1992). Importantly, defendant admitted that he had not told anyone that Joyce had attacked him at his initial interview or at any other point before trial, despite being asked outright about physical altercations between himself and Joyce. In fact, during his initial police interview, he denied any involvement in Joyce's death. Defendant's testimony therefore lacked credibility, and the jurors might reasonably have inferred that defendant lied about Joyce's attack or, at least, had not testified truthfully regarding his need for defensive action. *Unger*, 278 Mich App at 227 (explaining that "[a] jury may infer consciousness of guilt from evidence of lying or deception.") The jurors were provided with a self-defense instruction at trial, and are presumed to have properly considered that defense

-8-

during deliberations.  *People v Abraham*, 256 Mich App 265, 278-279; 662 NW2d 836 (2003). Viewing the evidence in a light most favorable to the prosecution, sufficient evidence was therefore presented to support a rational trier of fact's conclusion that defendant did not act in self-defense.

## IV.  INVOLUNTARY MANSLAUGHTER INSTRUCTION

Third, defendant argues that the trial court erred when it instructed the jury to consider the charge of voluntary manslaughter without also instructing the jury to consider the offense of involuntary manslaughter.  Defendant failed to preserve this issue by objecting to the trial judge's instructions or requesting an involuntary manslaughter instruction at trial.  *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000).  Indeed, defense counsel affirmatively stated that he had no objections to the jury instructions as read during trial. This affirmative statement constituted express approval of the instructions that waived review of any claim of instructional error on appeal.  *People v Lueth*, 253 Mich App 670, 688; 660 NW2d 322 (2002).  Accordingly, defendant is not entitled to relief on this issue.[2]

## V.  FURTHER INSTRUCTION ON VOLUNTARY MANSLAUGHTER

In his Standard 4 brief, defendant argues that the trial court erred when it failed to provide the jury with additional instructions on the offense of voluntary manslaughter.  As with the previous claim for instructional error, defendant waived this issue when he approved the final jury instructions.  *Lueth*, 253 Mich App at 688.  Again, however, we have considered the issue and found that it lacks merit.

A trial court is required to instruct the jury on the law applicable to the case and to present the case to the jury in a clear and understandable manner.  *People v Henry*, 239 Mich App 140, 151; 607 NW2d 767 (1999).  "Even if somewhat imperfect, [jury] instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights."  *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000).

Although defendant alleges that the trial judge improperly refused the jurors' specific request for additional instructions on the offense of voluntary manslaughter, the record does not support this contention.  The jurors did not express any lack of understanding with regard to the instructions.  Further, defendant's assertion that the jury may have acquitted him after receiving further instructions on voluntary manslaughter and self-defense is mere conjecture.  There is no indication that, given additional instructions, the jurors would have reached a different conclusion.  A review of the record reveals that the trial court properly informed the jury during its final instructions regarding both voluntary manslaughter and self-defense.  Additionally, at

---

[2] If we were to consider the issue, we find that the record reveals that the evidence presented at trial did not support an instruction on involuntary manslaughter.  Therefore, the trial judge did not err when he failed to provide one.

the request of defense counsel, the trial court recalled the jurors to clarify that self-defense would negate either second-degree murder or voluntary manslaughter, preventing the jury from limiting the application of self-defense to the second-degree murder charge. Jurors are presumed to follow the instructions given by the trial court. *Graves*, 458 Mich at 486. Read as a whole, the jury instructions fairly presented the issues and sufficiently protected defendant's rights. Therefore, we find no error.

## VI. ABUSE OF PROSECUTORIAL POWER

In his Standard 4 brief, defendant also claims that the prosecutor abused his power when he "overcharged" defendant with first-degree premeditated murder. Defendant did not preserve the issue of prosecutorial overcharge by raising the issue before the trial court. *People v Grant*, 445 Mich 535, 546; 520 NW2d 123 (1994). We review unpreserved issues for plain error. *People v Young*, 472 Mich 130, 135, 143; 693 NW2d 801 (2005). To satisfy the plain error standard, a defendant must show (1) an error, (2) that the error was clear or obvious, and (3) that the error affected his substantial rights by causing him prejudice. *People v Borgne*, 483 Mich 178, 196-197; 768 NW2d 290, aff'd 485 Mich 868 (2009). We review the prosecutor's charging decisions for an "abuse of power," examining whether the prosecutor acted in contravention of the constitution or the law. *People v Barksdale*, 219 Mich App 484, 487; 556 NW2d 521 (1996).

Courts have a narrow scope of review over the prosecuting attorney's charging decisions. *Id.* at 487. In general, the prosecution "is given broad charging discretion," *People v Conat*, 238 Mich App 134, 149; 605 NW2d 49 (1999), and may bring any charges supported by the evidence, *People v Yeoman*, 218 Mich App 406, 413-414; 554 NW2d 577 (1996). A prosecutor abuses his power only if "a choice is made for reasons that are "unconstitutional, illegal, or ultra vires." *Barksdale*, 219 Mich App at 488. In the absence of any claim or evidence of abuse of power in the prosecutor's charging decision, this Court does not question that choice. *Id.* at 489.

Defendant argues that the prosecutor should not have charged him with first-degree premeditated murder because the evidence tended to show that Joyce had fought with defendant prior to her murder. Defendant has not alleged that the first-degree premeditated murder charge was brought for an unconstitutional, illegal, or illegitimate reason. Therefore, there is no basis for defendant's abuse of power claim. Further, defendant has not established prejudice as a result of the prosecutor's decision to charge defendant with first-degree premeditated murder because defendant was not convicted of first-degree murder. At trial, the court directed a verdict of acquittal on that charge and defendant was ultimately convicted of the lesser included offense of voluntary manslaughter. Without a showing of prejudice, defendant cannot satisfy the plain error standard and is not entitled to relief on this issue. *Carines*, 460 Mich at 763.

## VII. *BRADY*[3] VIOLATION

In his Standard 4 brief, defendant also alleges that he was deprived of a fair trial when the prosecutor improperly withheld favorable evidence. Defendant failed to preserve this issue by

---

[3] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

-10-

raising it before the trial court. Therefore, we review for plain error affecting defendant's substantial rights. *Id.* at 774. Due process claims, such as those involving allegations of a *Brady* violation, are reviewed de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

Discovery in a criminal case is governed by MCR 6.201, which requires the prosecution to disclose to defendant "any exculpatory information or evidence known to the prosecuting attorney." MCL 6.201(B)(1); *People v Phillips*, 468 Mich 583, 588; 663 NW2d 463 (2003). Although it is well recognized that "[t]here is no general constitutional right to discovery in a criminal case," *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000), a defendant's right to due process may be violated by the prosecution's failure to produce exculpatory evidence. Under *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the prosecution is required to turn over evidence in its possession that is both favorable to the defendant and material to guilt or punishment. A *Brady* violation occurs when (1) evidence is suppressed by the prosecution either inadvertently or in bad faith, (2) the evidence is favorable to the accused because it is either exculpatory or impeaching, and (3) the evidence is material, i.e., there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

Defendant has not established a *Brady* violation. First, there is nothing to indicate that the prosecution "suppressed" any evidence. Defendant claims that the prosecutor improperly withheld recordings of telephone calls he had made to potential witnesses while he was incarcerated. However, defendant has provided no proof that the prosecution possessed any such recordings. The prosecution cannot "suppress" what it does not have access to. Additionally, our Supreme Court has made clear that when a defendant had knowledge of favorable evidence, the likelihood that a defendant can establish that the evidence was suppressed for purposes of a *Brady* claim is reduced. *Chenault*, 495 Mich at 155. Defendant cannot reasonably claim that the prosecution "suppressed" evidence of defendant's own telephone conversations, as defendant would have been fully informed of the substance of those conversations and aware of any conclusions to be drawn therefrom.

Defendant also claims that the prosecution withheld information "from defendant and from the jury" regarding outstanding arrest warrants for Joyce. The record is devoid of evidence supporting this claim. Additionally, even if this Court were to credit defendant's claim that the outstanding arrest warrants existed and were possessed by the prosecution, defendant cannot establish a *Brady* violation because he has failed to prove that any of the allegedly suppressed evidence was "exculpatory" or "material." Defendant does not claim that anything contained in his telephone conversations or in the arrest warrants negated an element of voluntary manslaughter or cast reasonable doubt on the prosecutor's theory of the case. Defendant claims only that the telephone conversations illustrated that he was attempting to find witnesses that were aware of Joyce's propensity for violence, and that the outstanding arrest warrants indicated that Joyce was a violent person. However, the fact that Joyce was violent, while perhaps lending weight to defendant's self-defense theory, was not exculpatory.

Assuming any of the allegedly suppressed evidence was admissible, defendant has not shown that its presentation would have had an effect on the outcome of defendant's trial.

Defendant makes the general observation that the "undiscovered evidence *could* reasonably have put the case in a different light and undermined confidence in the verdict." (Emphasis added.) Defendant's argument fails for lack of specificity. *People v Fox*, 232 Mich App 541, 549; 591 NW2d 384 (1998). Further, the jury was exposed to evidence of Joyce's potential for violence through testimony of several witnesses, including defendant. There is nothing to prove that the jury's decision would have been affected by the presentation of additional evidence on the matter. The evidence was therefore immaterial and the prosecutor's failure to disclose it to defendant did not constitute a *Brady* violation.

## VIII. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant claims that he was deprived of his constitutional right to the effective assistance of counsel when defense counsel (1) failed to call and cross-examine witnesses regarding Joyce's propensity for violence, and (2) failed to object to the prosecutor's use of improper rebuttal evidence. In his Standard 4 brief, defendant also claims that defense counsel's failure to conduct a proper investigation and adequately prepare for trial deprived defendant of the effective assistance of counsel. Defendant failed to preserve this issue by bringing a timely motion for a new trial or for a *Ginther*[4] hearing in the lower court. Therefore, our review is limited to mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Whether a person has been denied effective assistance of counsel is a mixed question of law and fact. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*.

There is a strong presumption that an attorney's assistance was effective, and the defendant bears the heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). To establish ineffective assistance, the defendant must show that "(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Heft*, 299 Mich App 69, 80-81; 829 NW2d 266 (2012). A defendant is prejudiced if there is a reasonable probability that, "but for defense counsel's errors, the result of the proceeding would have been different." *Heft*, 299 Mich App at 81.

### A. FAILURE TO ADEQUATELY INVESTIGATE

Counsel may be found to be ineffective due to lack of preparedness. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990). However, the defendant "must show that his counsel's failure to prepare for trial resulted in counsel's ignorance of, and hence failure to present, valuable evidence that would have substantially benefited" his case. *People v Bass (On Rehearing)*, 223 Mich App 241, 253; 565 NW2d 897 (1997), vacated in part on other grounds 457 Mich 866 (1998). Further, when making a claim of defense counsel's unpreparedness, a

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

defendant is required to show prejudice resulting from this alleged lack of preparation. *Caballero*, 184 Mich App at 640.

In his Standard 4 brief, defendant claims that defense counsel was constitutionally ineffective because he failed to share discovery materials and discuss defense matters with defendant. As a result, defendant claims that defense counsel was unable to present several important facts to the jury. However, this Court's review is limited to the record, *People v Crews*, 299 Mich App 381, 400; 829 NW2d 898 (2013), and the record is devoid of any of defense counsel's alleged investigative failings. Defendant's argument on appeal is that defense counsel's failure to properly investigate the case prevented him from adequately presenting his self-defense theory. Specifically, defendant asserts that, after a proper investigation, defense counsel would have discovered: (1) defendant had no means of escape from Joyce during her attack, (2) the cell phone found the following morning near defendant's couch did not work, and (3) his employer, Richard Truchan, had information regarding Joyce's propensity for violence and was available to testify. On this record, however, it is not clear that defense counsel lacked knowledge of the favorable information defendant claims was missing from trial. It is equally likely that defense counsel understood defendant's self-defense theory, and simply chose not to focus on the evidence defendant, in hindsight, believes to be important.

At trial, the prosecutor presented pictures of Danny's living room. Defense counsel could reasonably have expected the jury to infer that defendant's space had been limited at the time of Joyce's attack. Further, defense counsel could reasonably have concluded that defendant's claimed inability to escape would be unconvincing, given the relative sizes of Joyce and defendant and defendant's own testimony that he easily pushed Joyce off of him prior to stabbing her. Additionally, the fact that defendant could not escape was largely irrelevant, as there is no duty to retreat from an attack in one's dwelling. *People v Richardson*, 490 Mich 115, 120-121; 803 NW2d 302 (2011). The prosecutor also provided pictures of the cell phone in defendant's living room, and defense counsel was certainly aware of the cell phone's presence before cross-examining the evidence technician and eliciting defendant's self-defense account. Defense counsel's failure to question either witness about the cell phone's functionality was not unreasonable. Assuming the cell phone was, in fact, nonfunctioning, defense counsel could surely have concluded that this fact was not "valuable" or "highly beneficial" to the defense theory. Defendant avoided the police for nearly an hour and a half on the morning Joyce's body was discovered. He admits in his Standard 4 brief that the police found an additional functioning cell phone on the premises, and he told the jury at trial that he fell asleep on the couch rather than calling for help. The fact that the cell phone did not work would not overcome defendant's failure to seek help in another way. Defense counsel could reasonably have attempted to avoid any testimony related to defendant's failures, hoping that a focus on Joyce's attack would shift attention away from defendant's admitted shortcomings.

Finally, there is no evidence on the record that defense counsel failed to investigate Truchan and his potential testimony, or that defense counsel's decision not to call him at trial was anything other than reasonable trial strategy. In support of his position, defendant attached an affidavit purportedly provided by Truchan to his Standard 4 Brief on appeal. This affidavit is not part of the lower court record and we need not consider it. See MCR 7.210(A); *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008). In the affidavit, Truchan claims that he knew of Joyce's reputation for violence through conversations with defendant and another

-13-

employee familiar with Joyce.  Truchan does not claim to have known Joyce personally.  Even if we were compelled to consider the affidavit, we find that Truchan's intended testimony consisted solely of inadmissible hearsay.  Additionally, while Truchan claims that he was never contacted by defense counsel, the failure to interview witnesses does not alone establish inadequate preparation.  *Caballero*, 184 Mich App at 640.  Truchan claims to have been at defendant's trial and ready to testify, but Truchan was at defendant's trial because he was on the prosecutor's witness list.  Defense counsel could reasonably have decided not to call Truchan, who could only have provided inadmissible testimony, concluding that any evidence he provided would be favorable to the prosecution.

Decisions regarding what evidence to present, *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004), and whether to call or question witnesses, *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012), are presumed to be matters of trial strategy.  Defendant has provided no evidence that defense counsel failed to reasonably investigate the case, *People v Trakhtenberg*, 493 Mich 38, 51–55; 826 NW2d 136 (2012), or that defense counsel's performance failed to meet an objective standard of reasonableness under prevailing professional norms, *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012).  The fact that defense counsel's strategy at trial did not work does not render his performance ineffective.  *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

## B.  FAILURE TO CALL AND CROSS-EXAMINE WITNESSES

Defendant has not shown that defense counsel's failure to call Truchan or cross-examine Danny, Brown, or Howze on the subject of Joyce's propensity for violence constituted ineffective assistance of counsel.  Defendant's claim easily fails with regard to Truchan.  Even if we were to consider the affidavit attached to defendant's Standard 4 brief on appeal, Truchan's intended testimony clearly consists of inadmissible hearsay.  MRE 801; MRE 802.  Counsel cannot be faulted for failing to present inadmissible evidence.  Further, the record fails to support defendant's claim with regard to Danny, Brown, and Howze because defendant has not made an offer of proof regarding the substance of any favorable testimony these witnesses might have provided.  Presumably, defendant believes that these witnesses would present evidence that Joyce had a reputation for violence.  While this evidence might bolster defendant's self-defense theory, nothing in the record suggests that any of these witnesses would so testify.  Although each of these individuals testified that they were familiar with Joyce and that they had heard defendant and Joyce fighting in the past, nothing in their testimony suggested that Joyce fought with anyone else or that Joyce was prone to physical violence.  Defendant has not submitted an affidavit from either of the two living witnesses[5] attesting to knowledge of Joyce's alleged

---

[5] As previously stated, Howze passed away prior to trial, although he was thoroughly cross-examined by defendant's previous court appointed attorney at the preliminary examination.  Because his testimony was presented through a reading of the preliminary examination transcript, defense counsel can hardly be faulted for failing to cross-examine him at trial.  Indeed, defense counsel "vigorously" objected to the presentation of Howze's testimony, and the trial court allowed its admission after determining that defendant's prior attorney had been given a sufficient opportunity for cross-examination.

-14-

violent proclivities, nor has he presented any evidence that would support his assertion that Joyce was known in the community for a violent character. Defendant cannot establish a claim of ineffective assistance of counsel by merely speculating about what additional testimony witnesses could provide. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Without an offer of proof that additional information regarding Joyce's character would have aided his defense, defendant has failed to establish the necessary factual predicate for his ineffective assistance of counsel claim. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Additionally, even if we accepted defendant's assertion that these witnesses' testimony would have aided defendant's self-defense theory, defendant cannot overcome the presumption that defense counsel's decision not to elicit this testimony was a matter of trial strategy. First, there is evidence that defense counsel conducted an investigation into Joyce's relations, at least on the day of the murder. Defense counsel requested a special investigator to track Joyce's whereabouts and interactions on the day leading up to the incident, and the trial judge granted the request. On this record, defendant cannot refute the possibility that defense counsel investigated and considered Joyce's character and it was simply nonviolent. Additionally, defense counsel may have made the decision to rely on defendant's testimony regarding self-defense, rather than turn defendant's trial into a contest of character. At least in his brief on appeal, defendant seems to forget that once Joyce's reputation for violence had been raised as an issue, defendant's violent history would be opened up for review. MRE 404(a)(1)-(2). Defendant has at least one violent incident in his past—a conviction for assault with intent to commit murder. Although the fact of the conviction itself would be inadmissible absent special circumstances, defense counsel might reasonably have expected defendant's reputation to reflect his violent history. MRE 404(b)(1); MRE 405. Defense counsel may have purposefully avoided discussions of Joyce's character in order to keep this information from the jury. We do not second guess defense counsel's strategic decisions regarding what evidence to present or how to question witnesses. *Dixon*, 263 Mich App at 398 (internal citations and quotations omitted).

Finally, defendant has failed to prove that additional information regarding Joyce's reputation for violence would have led to a different outcome at trial. The jury heard several allegations of violence on Joyce's part. Danny and Brown both testified that Joyce would often fight with defendant after she had been drinking. Additionally, defendant testified both that Joyce often fought with people in the community and that she had been the initial aggressor on the evening of the murder. Defendant has not shown that additional testimony regarding Joyce's violent character would be anything but cumulative. Further, the failure to call or question witnesses constitutes ineffective assistance of counsel only when it deprives defendant of a substantial defense. *Id*. The sole purpose for evidence regarding Joyce's alleged propensity for violence was to bolster defendant's assertion that he had acted in self-defense, an assertion he was not deprived of the opportunity to present. Indeed, the jurors were instructed to consider defendant's asserted self-defense theory, and they were free to accept or reject it. *Schumacher*, 276 Mich App at 179-180. The fact that they chose to disbelieve defendant's claim of self-defense, even after hearing evidence of Joyce's violence, does not mean that defendant was deprived of his defense.

## C. FAILURE TO OBJECT TO IMPROPER REBUTTAL

Defendant also argues that defense counsel's failure to object to the prosecution's presentation of his recorded interview and the testimony of a police officer amounted to ineffective assistance of counsel. Defendant claims that the prosecution's use of his interview statements was improper because such evidence was inadmissible under MRE 608(b) and MRE 609, and that defense counsel's failure to object on those grounds was unreasonable. These claims lack legal merit.

Although the prosecution did not present the recorded interview with defendant during its case in chief, it sought to introduce the video as rebuttal evidence after defendant advanced his self-defense theory. Defendant objected on the basis that the interview had been involuntary and that it was, therefore, improper impeachment evidence. After a *Walker*[6] hearing, the trial judge found that defendant had voluntarily participated in the interview and that his statements were therefore admissible. Defendant did not raise any further objections.

During the recorded interview, defendant did not mention that he had acted in self-defense or that Joyce had attacked him. Rather, he repeatedly denied any involvement in Joyce's death. When asked why he had not told his self-defense story until trial, defendant claimed to have been "dazed and confused" as a result of alcohol withdrawal during his initial interview with police. The prosecutor played several portions of the recorded interview for the jury to provide it with an opportunity to assess defendant's behavior, and then called an officer to testify that defendant's demeanor had been consistent throughout his 90 minute interview.

Contrary to defendant's assertion, defendant's recorded interview and the testimony of an interviewing officer were proper vehicles for the prosecutor's introduction of defendant's own statements, which were clearly relevant under MRE 401 and admissible as nonhearsay, despite being made out of court, under MRE 801(d)(2). Although defendant claims that the video and accompanying officer testimony were inadmissible under MRE 608(b) as "specific instances of conduct," defendant's novel interpretation of MRE 608(b) is simply unsupported by the plain language of the rule or the context in which it applies. MRE 608 sets forth the rules regarding introduction of character evidence to attack or support the credibility of a witness. Under MRE 608(b), specific instances of a witness's conduct may, "if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." It is unclear what "specific instance of conduct" defendant argues was inadmissible here. However, neither the recording of defendant's interview or the officer's testimony regarding defendant's interview were introduced to attack defendant's general character for truthfulness or untruthfulness, and MRE 608(b) therefore does not apply. MRE 609(a), which prohibits the introduction of evidence that a witness has been convicted of a crime for the purpose of attacking the witness's credibility, is similarly inapplicable. At no point in the prosecution's presentation of rebuttal evidence was a prior conviction introduced.

---

[6] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

Because MRE 608 and MRE 609 clearly did not prohibit the introduction of the prosecution's rebuttal evidence, any objections raised by defense counsel at trial would have been overruled. Because defense counsel is not ineffective for failing to raise futile objections, defendant is not entitled to relief on this issue. *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005).

## IX. HABITUAL OFFENDER STATUS

Next, defendant argues that the trial court erred when it allowed the prosecutor to amend the notice of habitual offender status at defendant's sentencing hearing. Further, defendant argues that, based on the legislature's intent to enhance the sentences of only "habitual" offenders, the sentencing enhancement statutes do not apply in his case. Again, we disagree.

Because defendant failed to raise these issues for consideration by the trial court, they are not preserved for appellate review. *People v Conner*, 209 Mich App 419, 423; 531 NW2d 734 (1995). We review unpreserved issues for plain error affecting defendant's substantial rights. *Young*, 472 Mich at 135. Statutory interpretation is an issue of law which this Court reviews de novo. *People v Swafford*, 483 Mich 1, 7; 762 NW2d 902 (2009).

Defendant argues that the trial court erred in allowing the prosecution to amend the notice of habitual offender status in the information at sentencing. However, it should be noted at the outset that the record is devoid of any evidence that the prosecutor sought to amend the information or that defendant objected to any such amendment. Because the record on appeal does not support defendant's assignments of error, defendant has waived this issue. *Petri*, 279 Mich App at 410. However, we note that defendant's claim is also without merit.

Defendant was sentenced as a third habitual offender, MCL 769.11, which allows for the enhancement of a criminal sentence if a defendant has two or more prior felony convictions. MCL 769.11(1). MCL 769.13 governs the procedure for seeking sentence enhancement as a habitual offender. Under MCL 769.13(1), the prosecutor may seek to enhance the sentence of a defendant under the habitual offender statutes—MCL 769.10, MCL 769.11, or MCL 769.12— "by filing a written notice of his or her intent to do so within 21 days after the defendant's arraignment." Under MCL 767.76,

> [a]n information may be amended at any time before, during, or after trial to cure any defect, imperfection, or omission in form or substance, including a variance between the information and the proofs, as long as the accused is not prejudiced by the amendment and the amendment does not charge a new crime. [*People v Higuera*, 244 Mich App 429, 444; 625 NW2d 444 (2001), citing MCL 767.76.]

This Court reads MCL 769.13(1) and MCL 767.76 to prohibit amendments to the information after the 21 day period provided in MCL 769.13(1) that would increase a defendant's potential sentence. *People v Siterlet*, 299 Mich App 180, 186; 829 NW2d 285 (2012), vac'd in part on other grounds 495 Mich 919 (2013). This includes changes to the habitual offender notice. *People v Hornsby*, 251 Mich App 462, 472–473; 650 NW2d 700 (2002).

The felony information charging defendant with first-degree premeditated murder provided notice that defendant would be sentenced as a third habitual offender if convicted. The

information specifically listed the two prior offenses relied upon in support of the enhancement: a 1989 breaking and entering of a vehicle, MCL 750.356a, conviction and a 1990 assault with intent to commit murder, MCL 750.83, conviction. Defendant acknowledged both of the prior convictions and that he had received notice of his status as a third habitual offender at his arraignment and on the first day of trial. Defendant was therefore properly notified of the prosecution's decision to seek enhanced sentencing within the 21 day period required by MCL 769.13(1). At sentencing, the prosecutor reminded the court of defendant's "prior convictions for burglary and for assault with intent to murder," and defendant did not object when the trial court thereafter sentenced him as a third habitual offender. Indeed, defendant admitted to the breaking and entering of a vehicle felony conviction, although he argued that "the Court of Appeals threw that conviction out."

Presumably, defendant objects to the prosecutor's later substitution of defendant's 1990 felony-firearm, MCL 750.227b, conviction, which was provided for in defendant's PSIR but previously overlooked by the prosecutor, with defendant's 1989 breaking and entering of a vehicle conviction. Defendant is correct that, if *neither* of these convictions could be counted under the habitual offender statutes, defendant should have been sentenced as a second habitual offender. However, this writer would submit that *both* of these offenses could be counted as prior felonies under the habitual offender statutes, and defendant cannot assert prejudice as a result of the prosecutor's decision to concede one of them. Indeed, while defendant claimed that this Court reversed his 1989 breaking and entering of a vehicle conviction, he offered no evidence of the reversal at his sentencing hearing, his resentencing hearing, or on appeal. The prosecution could therefore have properly considered it for sentence enhancement purposes. Defendant knew that a third habitual offender enhancement was sought as early as his arraignment, regardless of which two of defendant's three prior felonies was specifically listed on the information. In any event, defendant waived any claim of error related to the amendment of the habitual offender notice by repeatedly admitting his status as a third habitual offender. *Siterlet*, 495 Mich at 919.

In his Standard 4 brief, defendant also argues that his sentence should not be enhanced under the habitual offender statutes because his prior felonies occurred "nearly a quarter century apart" and hardly evidence a pattern of "habitual" offending. In support of his argument, defendant suggests that the habitual offender statutes imply a Legislative intent to impose a time limitation for inclusion of felony convictions. According to defendant, the use of the word "habitual" evidences intent to include only those offenders who, based on a purported dictionary definition of "habitual," act under an "involuntary pattern of behavior acquired by frequent repetition." In interpreting statutes, this Court starts by examining the plain language of the statute. If the statutory language is plain and unambiguous, then no judicial interpretation is necessary or permitted, and this Court presumes that the Legislature intended the meaning it plainly expressed. *People v Mattoon*, 271 Mich App 275, 278; 721 NW2d 269 (2006). "Only if the statutory language is ambiguous may [this Court] look outside the statute to ascertain the Legislature's intent." *People v Haynes*, 281 Mich App 27, 29; 760 NW2d 283 (2008). Further, this Court "may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id*.

Defendant's claim fails because the plain language of the sentence enhancement statutes, MCL 769.10 *et seq.*, does not limit sentence enhancement to "habitual offenders." Indeed,

despite the fact that the statutes are frequently referred to as the habitual offender statutes, the word "habitual" does not appear in the statutes or even in their respective titles. For example, the statute pursuant to which defendant's sentence was enhanced, MCL 769.11, reads as follows:

> If a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies, whether the convictions occurred in this state or would have been for felonies or attempts to commit felonies in this state if obtained in this state, and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 131 of this chapter . . . . [MCL 769.11(1).]

The statute clearly provides for the application of sentence enhancement to any "person" who "has been convicted of any combination of 2 or more felonies." Identical language appears in MCL 769.10 and MCL 769.12, though the number of prior felony convictions required for enhancement differs in each. The statutes' language is clear and unambiguous. They apply to all offenders that have been convicted of a certain number of felonies or attempts to commit felonies, regardless of when they occurred or what they say about the defendant's character or "habit."

## X. SEPARATE FELONIES FOR SENTENCE ENHANCEMENT

Next, defendant argues that the trial court erred when it treated two convictions arising from the same transaction as separate convictions for purposes of sentencing defendant as a third habitual offender. This issue is also unpreserved, *People v Metamora Water Service, Inc*, 276 Mich App 376, 383; 741 NW2d 61 (2007), and we review for plain error affecting defendant's substantial rights, *Young*, 472 Mich at 135. Statutory interpretation and constitutional issues present issues of law, which this Court reviews de novo. *Swafford*, 483 Mich at 7.

In 1989, defendant was convicted of assault with intent to commit murder and felony-firearm, two convictions arising out of a single incident. In 1990, convictions arising out of a single incident were treated as one offense for the purpose of enhancing a defendant's sentence as a habitual offender. *People v Stoudemire*, 429 Mich 262, 273; 414 NW2d 693 (1987), overruled by *People v Gardner*, 482 Mich 41 (2008). In 2008, however, our Supreme Court overruled *Stoudemire* and held that the plain language of the habitual offender statutes "directs courts to count each separate felony conviction that preceded the sentencing offense, not the number of criminal incidents resulting in felony convictions." *Gardner*, 482 Mich at 44. On appeal, defendant acknowledges the Supreme Court's decision in *Gardner*, but argues that the trial court's application of *Gardner*'s rule to his 1989 convictions violates ex post facto laws. Defendant's argument lacks merit.

Ex post facto laws are prohibited by the United States Constitution and the Michigan Constitution. US Const, art 1, § 10; Const 1963, art 1, § 10. A statute violates the Ex Post Facto Clauses if it "affects the prosecution or disposition of criminal cases involving crimes committed before its effective date" and "increases the punishment." *People v McRunels*, 237 Mich App 168, 175; 603 NW2d 95 (1999) (quotations and citations omitted).

In *People v Callon*, 256 Mich App 312, 320; 662 NW2d 501 (2003), this Court noted that ex post facto challenges to habitual offender statutes have been rejected. The Court relied in part on the Supreme Court's discussion of ex post facto laws in *People v Palm*, 245 Mich 396; 223 NW 67 (1929). In *Palm*, the Supreme Court stated:

> In Cooley on Constitutional Limitations (8th Ed.) p. 553, it is said: "And the law is not objectionable as ex post facto which, in providing for the punishment of future offenses, authorizes the offender's conduct in the past to be taken into the account, and the punishment to [be] graduated accordingly. Heavier penalties are often provided by law for a second or any subsequent offense than for the first; and it has not been deemed objectionable that, in providing for such heavier penalties, the prior conviction authorized to be taken into the account may have taken place before the law was passed. In such case, it is the second or subsequent offense that is punished, not the first." [*Id*. at 402-403.]

This Court is bound by *Callon* and must reject defendant's claim that the application of *Gardner* in his case violates the Ex Post Facto Clauses. See MCR 7.215(J)(1) (stating that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990.") The application of *Gardner* does not increase punishment for crimes committed before it was decided, nor does *Gardner*'s interpretation of the habitual offender statutes impose additional punishment for prior offenses. Here, defendant's assault with intent to murder and felony-firearm convictions were considered only for the permissible purpose of enhancing the appropriate penalty for the instant conviction. Accordingly, the trial court did not err when it considered each of defendant's 1990 felonies as a separate conviction and sentenced defendant as a third habitual offender.

## XI. COSTS AND FEES

Next, defendant argues that the trial court abused its discretion when it denied defendant's request to set aside its assessment of costs and attorney fees. Because defendant failed to raise a timely objection for the lower court's consideration, this issue is unpreserved. *Grant*, 445 Mich at 546. Ordinarily, this Court reviews unpreserved issues for plain error affecting a defendant's substantial rights. *Carines*, 460 Mich at 750. However, because defendant is required to first contest costs and fees with the trial court, this issue is unripe for this Court's review.

At the initial sentencing hearing, the trial court judge ordered defendant to pay $600 in court costs and $600 in attorney fees. The trial court clearly had authority to impose such costs and fees. Pursuant to MCL 769.1k, if a defendant is found guilty following a trial, the trial court may impose fees and costs, including the expenses of providing legal assistance to the defendant. See MCL 769.1k(b)(iv). Courts are not required to conduct an "ability-to-pay assessment" before imposing costs and fees. However, such an assessment is required once the imposition of a fee is enforced and the defendant challenges his ability to pay. *People v Jackson*, 483 Mich 271, 296; 769 NW2d 630 (2009).

On appeal, defendant argues that because enforcement of his fees has already begun and he made a timely objection based on his inability to pay, the trial court abused its discretion

when it denied defendant an opportunity to contest the amount of costs and fees assessed.  It is true that, because an indigent defendant may not be required to pay costs and fees assessed under MCL 769.1k, defendant is entitled to an ability to pay assessment once the trial court actually enforces the fee and defendant contests his ability to pay.  *Id*. at 292-293, 298.  However, contrary to his assertion on appeal, defendant has not properly contested his ability to pay.  Defendant did not object to the court's assessment of costs and fees at the initial sentencing hearing.  Subsequently, he raised a blanket objection to the imposition of "costs and fees" at the resentencing hearing, without providing a basis for the objection.  At no point during either hearing did defendant claim to be unable to pay.  Even on appeal, while defendant suggests that he should be allowed to contest his ability to pay, he does not argue that he *lacks* the ability to pay.  Because defendant has not contested his ability to pay with the trial court, a review of his challenge on appeal would be inappropriate.

## XII.  RESTITUTION ORDER

Finally, in his Standard 4 brief, defendant argues that the trial court erred when it imposed a restitution order without following the statutory requirements for doing so.  "This Court generally reviews an order of restitution for an abuse of discretion." *People v Dimoski*, 286 Mich App 474, 476; 780 NW2d 896 (2009).  However, "[t]he proper application of MCL 780.766(2) and other statutes authorizing the assessment of restitution at sentencing is a matter of statutory interpretation, which we review de novo." *People v McKinley*, 496 Mich 410, 415; 852 NW2d 770 (2014).

The statutes governing restitution in criminal cases contain both a time limit and a requirement that the trial court disclose information relied upon when setting the restitution amount.  MCL 780.766 directs a trial court to impose restitution "when sentencing a defendant convicted of a crime."  MCL 780.766(2).  Although the trial court may amend a restitution order at the request of the prosecutor, the victim, or the defendant at any time "based upon new information," MCL 780.766(22), no statutory authority exists to support the trial court's imposition of a new restitution order after sentencing.  Further, MCL 780.766(3) and (4) list the appropriate considerations for determining the amount of restitution, and MCL 780.767(3) mandates disclosure to both the defendant and the prosecutor of "all portions of the presentence or other report" the trial court relies upon "[i]n determining the amount of restitution to order."

At defendant's original sentencing hearing, the trial court did not impose a restitution order.  The trial court considered restitution, and explained: "[a]nd I don't know if there is any restitution[;] it seems like there should be restitution in this case[;] if there is any he has to pay it."  The prosecutor told the trial court that he would "check on that," but whether the prosecutor ever did so is unclear.  The presentence report recommended imposition of costs, fees, and a crime victim assessment, but "recommended restitution be set at zero."  Both the original judgment of sentence and the amended judgment of sentence are devoid of a restitution order.  At the resentencing hearing, the trial court ordered defendant to pay state costs, a crime victim assessment, $600 in court costs, and $600 in attorney fees—all amounts previously assessed and included in the original judgment of sentence—and the issue of restitution was not raised.  However, when the final judgment of sentence was entered after the resentencing hearing, it inexplicably ordered defendant to pay $600 in restitution.

It may be the case that the inclusion of the restitution order was simply a mistake by the order's drafter. However, given that courts speak through their written judgments, not their oral statements, we must conclude that the judgment of sentence accurately reflects the sentence. *People v Jones*, 203 Mich App 74, 82; 512 NW2d 26 (1993) (noting that "[a] court speaks through written judgments and orders rather than oral statements.") Thus, we must assume that the restitution order was purposefully imposed without notice to defendant. In that case, the imposition of the restitution order clearly "fell short of the statutory requirements." *People v White*, 212 Mich App 298, 316; 536 NW2d 876 (1995).

Restitution encompasses only those losses which are easily ascertained and measured and are a direct result of a defendant's criminal acts. *People v Tyler*, 188 Mich App 83, 89; 468 NW2d 537 (1991). Before the imposition of a restitution order, the trial court is required to consider whether defendant's crime "result[ed] in damage to or loss of destruction of property," or "result[ed] in physical or psychological injury to the victim." MCL 780.766(3) and (4). Without any record indicating that the trial court engaged in such consideration, "it is impossible in the case at bar to ascertain whether the restitution order was for allowable damages and in an amount permitted." *White*, 212 Mich App at 316. Indeed, without supporting evidence, and in light of the PSIR's clear recommendation that restitution be assessed at zero, the restitution order is "essentially arbitrary and constitutes an abuse of the trial court's discretion." *Id*. We therefore vacate the restitution award and remand for reconsideration of the restitution order. *Tyler*, 188 Mich App at 89-90. On remand, the trial court must comply with the statutory procedures outlined in MCL 780.766 and MCL 780.767, or correct any drafting errors in the judgment of sentence. See MCR 6.435(A); MCR 7.216(A)(7); *People v Brown*, 492 Mich 684, 700 n 52; 822 NW2d 208 (2012) ("Where an error in the judgment of sentence rendered the sentence inconsistent with the sentence the court intended, we have ordered that the judgment of sentence be amended.")

We affirm defendant's conviction and sentence but vacate the restitution order and remand for reconsideration of the restitution award or correction of errors in the judgment of sentence. We do not retain jurisdiction.


/s/ Donald S. Owens
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens